UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUIS LIM,<br><br>      Plaintiff,<br><br>    v.<br><br>CHARLES SCHWAB & CO., INC.,<br><br>      Defendant.<br><br>FRANCIS X. FLEMING,<br><br>      Plaintiff,<br>    v.<br><br>THE CHARLES SCHWAB CORPORATION, et al.,<br>      Defendants. | Case Nos. 15-cv-02074-RS; 15-cv-02945-RS<br><br>**ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND** |

**I. INTRODUCTION**

Some years back, Plaintiffs Louis Lim and Francis Fleming opened retail brokerage accounts with Defendant Charles Schwab & Co., Inc. ("Schwab"). As part of those transactions, Plaintiffs were promised that whenever they elected to buy or sell a security, Schwab would route their order to a venue that would execute the trade at the best price possible for the customer. These disputes arise from Schwab's alleged failure to deliver on that promise. Specifically, notwithstanding its obligation to provide "best execution," Schwab contracted to route nearly all of its orders to a single venue, UBS Securities LLC ("UBS"). Plaintiffs assert this contractual obligation deprived them of the opportunity for price improvement in the marketplace. Accordingly, they bring claims for, among other things, breach of fiduciary duty and unfair competition for themselves and two putative classes. Schwab counters that plaintiffs' claims are

precluded by the Securities Litigation Uniform Standards Act ("SLUSA").  Schwab also asserts plaintiffs lack Article III standing and have not pleaded their claims with the requisite specificity.

For the reasons explained below, defendants' motions to dismiss are granted with leave to amend.  Lim's unfair competition, breach of fiduciary duty, unjust enrichment, and declaratory relief claims are precluded by SLUSA, as are Fleming's breach of contract, unfair competition, intentional misrepresentation, negligent misrepresentation, and aiding and abetting claims.

## II. FACTUAL BACKGROUND[1]

### A. Common Allegations

Defendant Charles Schwab & Co., Inc., is a securities brokerage and financial services corporation registered with the Securities and Exchange Commission ("SEC").  Schwab's business is centered on executing orders for stock and other investment trades on behalf of its clients.  Schwab specializes in "mom and pop" retail investors, and maintains millions of client accounts.  Under Schwab's pricing model, customers are charged a flat fee or "commission" for each trade that Schwab executes.

Plaintiffs Louis Lim and Francis Fleming are two of Schwab's retail customers.  Upon opening their brokerage accounts, they entered into an Account Agreement governing the trading relationship.  Pursuant to that agreement, Schwab provides them with "trade execution services."  Specifically, when plaintiffs elect to buy or sell a security, Schwab routes the trade to a venue that effectuates the purchase or sale.  When clients like Lim or Fleming specify the venue in which a trade is to be executed—for example, the New York Stock Exchange ("NYSE")—Schwab refers to the transaction as a client "directed order."  Conversely, when the client opts not to specify the venue, the order is called a "non-directed order."

The instant disputes arise from Schwab's alleged violation of its duty of "best execution" when routing non-directed orders to trading venues on behalf of its clients.  The duty of best

---

[1] The factual background is based on the averments in the complaints, which must be taken as true for purposes of a motion to dismiss.

execution is rooted in common law agency principles of undivided loyalty and reasonable care. It requires brokers to use reasonable diligence to ascertain the trading venue that will secure the most favorable price possible for the customer. Thus, when determining how to route trades, Schwab is required to examine material differences in execution quality among the various market centers. Among the factors Schwab must consider are execution price, market depth, order size, the trading character of the security, the efficiency and reliability of the order handling system, and the speed, efficiency, and accuracy of market center service.

Plaintiffs aver Schwab violates its duty of best execution because it has a contractual obligation to route nearly all of its non-directed orders to a single venue: UBS. Specifically, in 2004, Schwab entered into an Equities Order Handling Agreement ("EOHA") requiring it to send at least 95 percent of its non-directed orders to UBS. If it fails to do so, Schwab is liable for millions of dollars in liquidated damages.[2] According to Fleming, Schwab entered this contract in exchange for significant kickbacks in the form of direct payments for order flow ("PFOF") and various liquidity rebates. The upshot is that even though Schwab has eleven registered stock exchanges and more than fifty alternate trading systems to which orders can be routed, UBS consistently receives nearly all of Schwab's non-directed orders.

Plaintiffs contend this arrangement violates the duty of best execution because Schwab fails to consider the factors it is required to weigh when selecting the market center most favorable for trade execution. As a result, Schwab's clients lose the opportunity for price improvement in the broader marketplace, and fail to receive the most advantageous prices for their trades. Further, the EOHA explicitly allows UBS to trade against Schwab clients, meaning UBS captures trade opportunities for itself that would otherwise be available to clients like plaintiffs. In short, UBS routinely executes trades on behalf of Schwab's clients at prices less favorable than the best price

---

[2] Responding to this Court's order, defendants filed a copy of the EOHA, in part under seal, as the document was incorporated under the terms of the complaint and therefore may be considered on a motion to dismiss that complaint. *See Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) (noting courts may look to documents incorporated by reference into the complaint when resolving a motion to dismiss).

available, thereby depriving those clients of the best execution possible for their orders.

**B. Allegations Unique to the Fleming Complaint**

According to Fleming, UBS is willing to pay for Schwab's order flow because it increases its own profits. In particular, UBS operates an alternative trading system, also known as a "dark pool," in which trade orders are not publicly displayed. Dark pools like the one operated by UBS make money on each trade they execute. Thus, the preferred customers for dark pool operators are so-called high-frequency trading ("HFT") firms. The trading programs run by those firms allow traders to move in and out of positions opportunistically in seconds or less, shaving off fractions of a cent in profit each time. UBS's HFT desk seeks to trade against what is known in the industry as "dumb money"—retail investors without sophisticated equipment who execute their orders through discount brokerages like Schwab. Dumb money permits HFTs to profit because they can exploit the information these orders provide about what other traders are doing in the marketplace. According to Fleming then, Schwab fraudulently sought to maximize its own profits without regard to the interests of its customers by selling—in contravention of its best execution duty—substantially all client trades to UBS. Meanwhile, UBS exploits the "dumb money" it receives on its side of the transaction by feeding it into the UBS dark pool so HFT firms can usurp opportunities for price improvement.

Fleming avers a host of misrepresentations in connection with this conduct. To begin, Fleming contends the defendants made materially false representations by indicating they routed orders based on a variety of factors when they actually contracted to send nearly all orders to UBS. Fleming maintains these representations were contained in the Account Agreement and various other public statements on Schwab's website. Fleming next avers Schwab claims publicly to "focus on transparency and convenience," and touts there are "never any hidden fees." Compl. ¶ 49. Yet by deceptively routing trades to UBS, Schwab imposes "an undisclosed cost of doing business." Compl. ¶ 49. Continuing, Fleming avers Schwab advertises that it works "diligently to meet and exceed" the best execution criteria established by the SEC, and "regularly monitors the execution quality provided by different exchanges and liquidity providers." Compl. ¶ 51. Fleming

1    contends neither claim is actually true because nearly all of the non-directed orders end up with
2    UBS.  Fleming next notes that Schwab's Account Agreement only obliquely references the
3    contract with UBS.  Fleming avers Schwab intentionally fails to explain how this contract stymies
4    best execution. Compl. ¶ 55.  On HFT, Fleming observes individual defendant Walter W.
5    Bettinger II, Schwab's current CEO, called it a "cancer" "run amok," Compl. ¶ 75, yet at the same
6    time knew of the contract with UBS, and represented that Schwab provided customers with best
7    execution.  Finally, Fleming contends Schwab's public disclosures only vaguely discuss Schwab's
8    receipt of PFOF.  Fleming asserts these disclosures are misleading because they do not reveal the
9    loss investors suffer as a consequence of the UBS agreement.

10   On behalf of a putative class of similarly situated customers, Fleming asserts claims for
11   breach of contract, unfair competition, intentional misrepresentation, negligent misrepresentation,
12   and aiding and abetting the above violations against the Schwab defendants, which include The
13   Charles Schwab Corporation, Charles Schwab & Co., Inc. (collectively "Schwab"), and Walter W.
14   Bettinger II (collectively with Schwab, the "Schwab defendants").   Fleming asserts claims for
15   unfair competition and aiding and abetting the above violations against UBS.  On behalf of a
16   putative class of similarly situated customers, Lim asserts claims for unfair competition, breach of
17   fiduciary duty, unjust enrichment, and declaratory relief against Charles Schwab & Co., Inc.

### III. LEGAL STANDARD

19   A complaint must contain "a short and plain statement of the claim showing that the
20   pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  While "detailed factual allegations are not
21   required," a complaint must have sufficient factual allegations to "state a claim to relief that is
22   plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic v.*
23   *Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the pleaded factual
24   content allows the court to draw the reasonable inference that the defendant is liable for the
25   misconduct alleged." *Id.*  This standard asks for "more than a sheer possibility that a defendant
26   acted unlawfully." *Id.*  The determination is a context-specific task requiring the court "to draw on
27   its judicial experience and common sense." *Id.* at 679.

1        Additionally, Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To satisfy the rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). In other words, "the circumstances constituting the alleged fraud must be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba–Geigy Corp. U.S.A.*, 317 F.3d 1097, 1106 (9th Cir. 2003).

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Twombly*, 550 U.S. at 555 ("threadbare recitals of the elements of the claim for relief, supported by mere conclusory statements," are not taken as true).

### IV. DISCUSSION

**A. Standing**

As a threshold matter, Schwab asserts plaintiffs lack Article III standing. "To satisfy Article III's standing requirements, a plaintiff must show (1) she has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 868–69 (9th Cir. 2002) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Here, Schwab asserts plaintiffs fail to aver a particularized "injury in fact." Schwab's theory is the complaints do not pinpoint a single trade for which a failure of best execution caused plaintiffs to suffer an identifiable loss. Thus, Schwab suggests plaintiffs offer mere allegations of wrongdoing and unjustifiably infer that an injury followed.

Plaintiffs counter that the complaints articulate injury in three forms. First, plaintiffs paid commissions for each trade in which Schwab breached its fiduciary duty, and now seek restitution of that money. Second, Schwab's unlawful practices deprived customers of the best possible price for their trades because Schwab was barred from considering superior execution opportunities in the marketplace. Third, Schwab's contract with UBS ensures that its unlawful behavior will continue into the future, thereby exposing customers to an enduring risk of harm.

The standing inquiry presents a close question, but ultimately plaintiffs have adequately alleged the existence of an injury in fact. Plaintiffs' first alleged injury—the unlawful commissions—is contingent on the occurrence of the second injury—the failure to obtain the best possible price for Schwab trades. Plaintiffs are injured, in other words, only insofar as they have been denied best execution.

On that front, the parties dispute the basic question of whether the EOHA deprives customers of best execution. Schwab insists the EOHA simply outsources their best execution duty. Plaintiffs contend the EOHA requires that routing and execution be assessed in accordance with a proprietary methodology instead of the enumerated factors set forth in Schwab's Account Agreement. While it is not clear that this alone deprives clients of the best execution for their orders, plaintiffs insist injury nevertheless flows because UBS can trade against Schwab orders. As a result, UBS can capture trade opportunities for itself that would otherwise be available to the class, leading plaintiffs to conclude they likely did not receive the best possible price for all of

their trades.  At oral argument, plaintiffs conceded they could not be certain that they themselves suffered any pecuniary loss, but seek to establish that proposition through discovery.

Importantly, the Supreme Court instructs that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (quotation marks and citation omitted).   Given this standard, plaintiffs have adequately demonstrated economic injury sufficient to confer Article III standing.  There is no dispute that plaintiffs are members of the group subject to the business practice at issue.  Plaintiffs also aver their trades were routed to UBS, who, by way of the EOHA agreement, could stand between plaintiffs and the trade executer and thereby profit from that arrangement.  Recognizing that scores of other trading venues were simultaneously available, it is reasonable at this stage to glean from plaintiffs' allegations that they suffered a monetary loss.[3]  Were this case to proceed, however, plaintiffs could "no longer rest on such mere allegations," but would be compelled to "set forth by affidavit or other evidence specific facts." *Id.*

**B. SLUSA**

Defendants assert SLUSA precludes plaintiffs' claims.  SLUSA is part of a series of reforms targeting abuse of the class action vehicle in litigation involving nationally traded securities.  Congress began by passing the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which imposed heightened procedural and substantive requirements for filing securities class actions.  Inventive plaintiffs, however, sought to avoid the PSLRA by filing securities class actions in state court based on state laws.  Congress shot back with SLUSA, which prevents state law class actions alleging fraud from being used to frustrate the objectives of the PSLRA.

Specifically, "SLUSA bars private plaintiffs from bringing (1) a covered class action (2)

---

[3] Given this outcome, plaintiffs' argument that they suffer a real and immediate threat of repeated future injury because Schwab extended the timeline of the EOHA agreement need not be reached.

1  based on state law claims (3) alleging that defendant made a misrepresentation or omission or

2  employed any manipulative or deceptive device (4) in connection with the purchase or sale of (5) a

3  covered security." *Freeman Invs., L.P. v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1114 (9th Cir. 2013);

4  *see also* 15 U.S.C. § 78bb(f)(1).

Of these five elements, only two are at issue here: whether Schwab made "a misrepresentation or omission or employed any manipulative or deceptive device" "in connection with" the purchase or sale of a covered security. If these elements are met, SLUSA preclusion applies, and plaintiffs' state law claims must be dismissed.[4]

### 1. "misrepresentation"[5]

The first issue is whether plaintiffs' claims revolve around the premise that Schwab made "a misrepresentation or omission or employed any manipulative or deceptive device." In making this assessment, the Ninth Circuit has observed that SLUSA "operates wherever deceptive statements or conduct form the gravamen or essence of the claim." *Freeman*, 704 F.3d at 1115. As such, "plaintiffs cannot avoid preclusion 'through artful pleading that removes the covered words . . . but leaves in the covered concepts.'" *Id.* (quoting *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 311 (6th Cir. 2009)). Were it otherwise, "SLUSA enforcement would reduce to a formalistic search through the pages of the complaint for magic words—'untrue statement,' 'material omission,' 'manipulative or deceptive device'—and nothing more." *Id.* (internal quotation marks and citation omitted).

Here, Schwab asserts the complaints aver fraudulent conduct on the basis that plaintiffs accuse Schwab of falsely claiming to provide its customers with the best execution for their trades.

---

[4] A "covered class action" is a lawsuit in which damages are sought on behalf of more than 50 people. *See* 15 U.S.C. § 78bb(f)(5)(B). A "covered security" is one traded nationally and listed on a regulated national exchange. *See id.* § 78bb(f)(5)(E). A class action is based on state law if the claims arise under state law. These three elements are clearly met in the instant actions.

[5] Fleming contests this element only with respect to his breach of contract, unfair competition, and aiding and abetting claims. His argument is addressed generally here, and his specific contentions are dealt with in section four.

1    In particular, notwithstanding its representations in the Account Agreement, the complaints aver
2    Schwab routs customer trades to UBS when better prices may be available for customers, thereby
3    violating its federal regulatory duties that require a marketwide appraisal.  Schwab notes that the
4    SEC considers the failure to provide best execution a possible "manipulative, deceptive or
5    other[wise] fraudulent device," *In Re: Morgan Stanley & Co Inc.*, Exchange Act Release No.
6    55726, 2007 WL 1364323, at *8 (May 9, 2007), and directs the Court to authority applying
7    SLUSA preclusion to a failure to provide best execution.  *See, e.g.*, *Kurz v. Fidelity Management
8    & Research Co.*, 556 F.3d 639 (7th Cir. 2009); *Prager v. Knight/Trimark Group, Inc.*, 124 F.
9    Supp. 2d 229 (D.N.J. 2000).  Plaintiffs respond that the complaints do not allege fraud, deception,
10   or the intent to deceive, nor does misrepresentation operate as a factual predicate to their claims.[6]

11   Looking at the gravamen of the complaints, Schwab has the more persuasive argument.
12   Plaintiffs maintain the Account Agreement represented that their trades would receive the best
13   execution possible.  Plaintiffs then aver Schwab signed a contract with UBS that deprived them of
14   the opportunity for price improvements.  What is more, the agreement permits UBS to capture
15   trade opportunities for itself that would otherwise be available to plaintiffs.  Yet all the while,
16   Schwab continued to portray that it was affording clients "best execution." Given Schwab's
17   alleged failure to deliver the services that it promised, Schwab either misrepresented that best
18   execution would be achieved for its customers, or failed to disclose that best execution was no
19   longer possible.  In either case, plaintiffs are accusing Schwab of engaging in deceptive conduct.
20   Thus, looking at the heart of Lim and Fleming's complaints, this element of SLUSA is met.

21   **2. "in connection with"**

22   The second issue is whether Schwab's deception arises "in connection with" a securities
23   transaction.  As a preliminary matter, the parties dispute the appropriate legal standard.  Plaintiffs
24   point to *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014), where the Supreme Court

---

[6] Fleming does not make this argument in reference to his intentional and negligent misrepresentation claims.

held "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" *Id.* at 1066. Schwab counters that *Chadbourne* merely clarified the need for "a material connection" to a securities transaction. *Id.* Schwab draws support from *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006), where the Court found "it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else." *Id.* at 85.

Importantly, the *Chadbourne* Court did not purport to modify *Dabit*, nor did it dispute that SLUSA's construction corresponds with that of Section 10(b) of the Securities Exchange Act of 1934. *See Chadbourne*, 134 S. Ct. at 1066, 1069. It emphasized instead how *Dabit* is consistent with its holding. The Court noted the *Dabit* plaintiffs alleged stock manipulation that "coincided" with a securities transaction because it "induc[ed] the plaintiffs to 'hold their stocks long beyond the point when, had the truth been known, they would have sold.'" *Id.* (quoting *Dabit*, 547 U.S. at 75). Thus, in *Dabit*, the misrepresentation was material to an individual's decision to buy, sell, or hold a covered security.[7] Mindful of SLUSA's correspondence with Section 10(b), that is the standard appropriate here.[8]

Plaintiffs argue the complaints do not allege any misrepresentations intrinsically related to the securities being traded, and maintain Schwab's conduct did not induce them to buy, sell, or hold any particular security. Lim further opines that even though Schwab allegedly deprived him

---

[7] *Dabit*'s theory was that "[t]he research analysts, under management's direction, allegedly issued overly optimistic appraisals of the stocks' value; the brokers allegedly relied on the analysts' reports in advising their investor clients and in deciding whether or not to sell their own holdings[,]" and, as noted above, "the clients and brokers both continued to hold their stocks long beyond the point when, had the truth been known, they would have sold." *Dabit*, 547 U.S. at 75.

[8] The *Chadbourne* Court noted that each of its prior decisions—including *Dabit*, 547 U.S. at 75–77, *Sec. Exch. Comm'n v. Zandford*, 535 U.S. 813, 822 (2002), *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 590–92 (2001), *United States v. O'Hagan*, 521 U.S. 642, 655–57 (1997), and *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 (1971)—"concerned a false statement (or the like) that was 'material' to another individual's decision to 'purchase or s[ell]' a statutorily defined 'security' or 'covered security.'" *Id.* at 1069.

of the best possible price for his trades, Schwab's conduct "would not influence an investor's decision about whether to buy or sell a particular security." Opp'n at 11:13–15. Schwab responds that the heart of the complaints is the allegation it routes orders to a single venue that buys or sells equities at less than the best price available to Schwab's customers. Thus, Schwab insists the "in connection" element is plainly met because "best execution" necessarily arises from the purchase or sale of securities.

All told, the "in connection" element is met in the instant actions. The fraudulent conduct that forms the gravamen of the complaints—the false promise of best execution—is (1) directed at Schwab's clients (2) in order to induce them to purchase or sell securities through Schwab for a fee, and (3) caused losses directly resulting from what clients believed to be legitimate securities transactions. As a consequence, the deceptive conduct not only "coincides" with a securities transaction, but was material to the decision by clients like plaintiffs to buy or sell securities.

Plaintiffs' reliance on *Shaw v. Charles Schwab & Co., Inc.*, 128 F. Supp. 2d 1270 (C.D. Cal. 2001), and *Abada v. Charles Schwab & Co., Inc.*, 127 F. Supp. 2d 1101 (S.D. Cal. 2000), for the proposition that Schwab's deceptive conduct relates only to its relationship with its customers, rather than the value of the investments it executes, is misplaced. First, both cases predate *Dabit* and did not read the "in connection with" language as broadly as in the Section 10(b) context. *See Shaw*, 128 F. Supp. 2d at 1274; *Abada*, 127 F. Supp. 2d at 1102–03. *Dabit* overruled that holding and *Chadbourne* did not disturb *Dabit*. *See Dabit*, 547 U.S. at 85; *Chadbourne*, 134 S. Ct. at 1066. Second, the claims in both *Shaw* and *Abada* related to Schwab's technical inability to deliver its securities through a website. *See Shaw*, 128 F. Supp. 2d at 1274; *Abada*, 127 F. Supp. 2d at 1103. Here, by contrast, the deception does relate to the value of the security because Schwab represents it obtains the best possible price for its customers but repeatedly delivers something less. Third, even if Schwab's deceptive conduct is an inducement intended to cause customers to choose Schwab over competing brokers, that would not mean Schwab's misrepresentations were other than "in connection with" securities transactions; rather, the false promise that customers will receive the best price for their trades is material to *every* decision to purchase or sell a security

through Schwab. Finally, to accept plaintiffs' argument, Schwab's representation that plaintiffs would receive the best possible price for their orders would have to have been considered wholly immaterial to every decision to buy, sell, or hold a security plaintiffs made during the class period. The contention that plaintiffs made investment decisions without regard to the price at which their orders were filled is, at bedrock, simply implausible.[9]

Factually, plaintiffs aver they are party to the Account Agreement (and therefore were recipients of the misrepresentation) and submitted equity trades that Schwab unlawfully routed to UBS. Thus, the complaints allege deception that arose "in connection with" the purchase or sale of a security. *See Kurz*, 556 F.3d at 641 (noting the argument that a breach of the duty of best execution is not 'in connection with the purchase or sale' of securities is "frivolous" after *Dabit*). SLUSA's final preclusion requirement is therefore met.

### 3. SLUSA's Applicability to Lim's Claims

Importantly, "SLUSA does not require the dismissal of non-precluded claims along with precluded claims." *Proctor v. Vishay Intertechnology Inc.*, 584 F.3d 1208, 1227 (9th Cir. 2009). Here, however, each of the claims in Lim's complaint stems from Schwab's deceptive conduct. *See In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 150 (2d Cir. 2015) (noting SLUSA dismissal is appropriate where, as here, proof of the claims would require showing the false or deceptive conduct committed by the defendant). As a result, the unfair competition, breach of fiduciary duty, unjust enrichment, and declaratory relief claims must be dismissed.

### 4. SLUSA's Applicability to Fleming's Claims

Fleming avers the breach of contract, unfair competition, and aiding and abetting claims survive SLUSA because they do not allege a misrepresentation or omission. With respect to the breach of contract claim, Fleming maintains he avers only that his interpretation of what "best

---

[9] Though relevant only to one of the two instant actions, it is worth noting Fleming admits "[i]n . . . placing trade orders through Schwab, and paying commissions for those trades, plaintiff and the Class reasonably relied on the Schwab Defendants' materially misleading statements and omissions that their trades would be routed according to Schwab's best execution duty." Compl. ¶ 103 (emphasis added).

execution" entails is the better reading of a contract, and that Schwab breached that term of the contract by failing to perform accordingly.  Elsewhere, however, Fleming "does not contest that he has alleged a fraud . . . . Indeed, plaintiff and the class were defrauded by the Schwab Defendants' promise that Schwab would provide brokerage services wherein their clients would obtain the best execution of their trades."  Opp'n at 12:22–25; *see also id.* at 25:6–8 ("Schwab misrepresented that it would provide 'best execution' to its clients' trades in its client agreement when it knew that it was instead selling nearly all of its order flow to UBS in exchange for payment.").  In light of these statements, Fleming cannot credibly maintain that his breach of contract claim does not rely on a misrepresentation or omission that would render it subject to preclusion under SLUSA.

With respect to the unfair competition and aiding and abetting claims, Fleming maintains SLUSA does not require dismissal because § 17200 provides recovery for "unlawful" and "unfair" acts in addition to fraudulent business practices.  The unfair and unlawful acts Fleming draws on to establish Schwab's liability, however, involve the same deceptive conduct referred to above—Schwab's false representation that it would provide best execution.  Thus, Fleming's unfair competition and aiding and abetting claims do allege misrepresentations or omissions.[10]  Moreover, even if Fleming were correct, he does not explain how his UCL claims survive *Bowen v. Ziasun Technologies, Inc.*, 116 Cal. App. 4th 777 (2004), assuming SLUSA applies and the "in connection" element is met.[11]

Finally, Fleming's opposition brief does not address SLUSA's applicability to the claims against UBS, but preclusion is nevertheless appropriate for the same reasons articulated above.  Each allegation of deceptive conduct detailed in the complaint is incorporated in the two counts against UBS.  *See* Compl. ¶ 91, 111.  Further, Fleming's claims against UBS arise from the execution of his orders at "manipulated"—meaning artificially high or low—prices in the UBS

---

[10] It is worth noting each of Fleming's claims incorporate all of the prior allegations in the complaint. *See* Compl. ¶ 79, 84, 91, 98, 105, 111.

[11] This critique applies equally to Lim's unfair competition law claims.

dark pool. *See* Compl. ¶ 9, 49, 67.  Accordingly, the deceptive activity allegedly conducted by UBS occurred "in connection with" the purchase or sale of securities.

In sum, each of the claims in Fleming's complaint, whether against Schwab or UBS, stems from deceptive conduct made in connection with a securities transaction.  As a result, the unfair competition, breach of contract, intentional misrepresentation, negligent misrepresentation, and aiding and abetting claims must be dismissed.

## V. CONCLUSION

The motion to dismiss filed by Charles Schwab & Co., Inc. in the Lim action, and the motions to dismiss filed by Charles Schwab & Co., Inc., The Charles Schwab Corporation, Walter W. Bettinger II, and UBS, respectively, in the Fleming action, are granted with leave to amend. Lim's unfair competition, breach of fiduciary duty, unjust enrichment, and declaratory relief claims are precluded by SLUSA, as are Fleming's breach of contract, unfair competition, intentional misrepresentation, negligent misrepresentation, and aiding and abetting claims.[12] Should plaintiffs elect to amend their pleadings, they must lodge amended complaints within thirty (30) days from the date of this order.

**IT IS SO ORDERED**.

Dated: December 7, 2015

_____
RICHARD SEEBORG
United States District Judge

---

[12] As noted above, the complaints are deficient in whole based on SLUSA.  It therefore is not necessary to reach the other arguments in defendants' motions to dismiss.  It is worth noting the declaratory judgment and unjust enrichment claims would likely be subject to dismissal as neither generally constitute stand alone claims, with exceptions that do not appear to apply here. Additionally, in both complaints, plaintiffs do not appear to have adequately supported their claims under the "unfair" prong of the unfair competition law.